GILBERTO MIRANDA ET ALS., demandantes y recurrentes, *v.* SOCIEDAD GINECO-OBSTÉTRICA DEL NORTE ET ALS., demandados y recurridos.

*Número:* RE-90-67        *Resuelto:* 6 de marzo de 1992

*Víctor A. Vélez Cardona* y *Efrén T. Irizarry Colón,* de *Irizarry, Colón, Soler & Banuchi,* abogados de los recurrentes; *Juan E. Taboas Santiago* y *Graciany Miranda Marchand,* abogados de los recurridos.

## SENTENCIA

Examinados los autos originales, prueba documental y transcripción de evidencia parcial, procede revocar el dictamen del Tribunal Superior, Sala de Arecibo (Hon. Luis R. Cruz Jiménez, Juez), que declaró sin lugar la demanda presentada por Gilberto Miranda *et als.,* contra la Sociedad Gineco-Obstétrica del Norte.

El trasfondo de hechos nos mueve a concluir razonablemente que la muerte de la Sra. Hilda Muñoz Matos fue causada por negligencia, consistente —según opinó el Dr. Walter J. Benavent— en que no era candidata idónea para una cirugía de liposucción. Se le removió una cantidad sustancial y exagerada de líquido en una sola intervención, todo ello en contra de la mejor práctica de la medicina. T.E. de 9 de octubre de 1990, págs. 11 y 17. Por último, fue dada de alta prematuramente. Íd., pág. 17.

*Se devuelven los autos originales para que el foro de instancia evalúe los daños.*

Lo pronunció, manda el Tribunal y certifica el señor Secretario General. El Juez Asociado Señor Negrón García emitió una opinión concurrente, a la cual se unió el Juez Presidente Señor Andréu García. El Juez Asociado Señor Hernández Denton emitió una opinión concurrente. Los

Jueces Asociados Señores Rebollo López y Fuster Berlin-geri no intervinieron.

(*Fdo.*) Francisco R. Agrait Lladó
Secretario General

— O —

Opinión concurrente emitida por el Juez Asociado Señor Negrón García, a la cual se une el Juez Presidente Señor Andréu García.

I

Estamos conformes con la Sentencia revocatoria de este Tribunal. Se trata de un caso de comprobada impericia médica. Veamos.

Para 1987, la Sra. Hilda Muñoz Matos, de cuarenta y cinco (45) años, con sobrepeso, decidió someterse al procedimiento de cirugía cosmética denominada *liposucción*. La *liposucción* o aspiración de grasa fue desarrollada por un cirujano plástico francés. Se lleva a cabo bajo anestesia y consiste en abrir una pequeña herida por la cual se introduce una cánula de metal —recta o curva al final— unida en uno de sus extremos a un tubo de polietileno que, a su vez, está conectado a una máquina de succión. El cirujano mueve la cánula en el área de la grasa rompiendo las conexiones de fibra trabecular. De ese modo, finalmente se absorbe la grasa. J.D. Robertson y W.T. Keavy, *Plastic Surgery Malpractice and Damages*, Nueva York, Wiley Law Publications, 1990, págs. 312–315; 4 *Lawyers' Medical Cyclopedia* Sec. 31.27, págs. 544–545 (1980).

Antes de su ingreso al hospital, a la señora Muñoz Matos le practicaron pruebas rutinarias de sangre, orina, electrocardiograma y coagulación. Incluso, el 25 de mayo el Dr. Juan F. Rodríguez Acosta, internista, la examinó y certificó que estaba en buenas condiciones para someterse a dicha

operación. El 30 de marzo donó trescientos (300) cc de su propia sangre.

El 10 de abril de 1987 fue operada en el Arecibo Medical Center. Bajo anestesia general, el codemandado Dr. Edwin Candelario Torres le removió tres mil doscientos (*3,200*) centímetros cúbicos de tejido adiposo, que incluye una mezcla de agua, sangre, suero y la solución para la anestesia. Se le administraron trescientos (300) cc de sangre autóloga, doscientos (200) cc de plasma congelado fresco y dos mil (2,000) cc de otros líquidos, para un total de dos mil quinientos (*2,500*) cc. La cirugía duró dos (2) horas y quince (15) minutos. Después de estar durante cuatro (4) horas en la unidad de recuperación, fue dada de alta en aparente buen estado físico. Según el foro de instancia, "tenía una hemoglobina de 7.9 gramos y 25 de hematocritos, presión sanguínea post operatoria de 95/70, cuya presión es levemente baja pero que, sin embargo, en atención a otros signos vitales, señalaban que no había hipotensión[1] por lo cual se le dió de alta". Apéndice a la solicitud de revisión, pág. 11. Las áreas operadas fueron cubiertas con vendajes plásticos y se le puso una faja quirúrgica. Recibió instrucciones de no remover sus vendajes ni la faja especial, y de que debía ambular lo antes posible.

Durante los cuatro (4) días siguientes la señora Muñoz Matos se quejó de mareos a su esposo Gilberto Miranda. Por ello, el 13 de abril el doctor Candelario Torres ordenó un CBC que resultó normal. El 14, a las 2:15 P.M., una de sus hijas se comunicó con el Arecibo Medical Center y, conforme la nota de la Enfermera Graduada Sylvia Ruiz, le indicó que tenía "fiebre constante y mareos. Continúa tomando hierro según indicado, reh[ú]sa comer. Se notificará a Dr. Candelario para consultar". Apéndice a la solicitud de revisión, pág. 73. No pudo localizarse al doctor Candelario

---

[1] A saber, tensión excesivamente baja de la sangre en el aparato circulatorio.

Torres en su oficina, y su secretaria sugirió a dicha enfermera que llamara después de las 3:00 P.M. La enfermera Ruiz, a su vez, le comunicó a la hija en cuestión el resultado de sus gestiones. Subsiguientemente, esa misma tarde, previa comunicación telefónica al efecto, el doctor Candelario Torres le indicó al señor Miranda que llevara a su esposa al Arecibo Medical Center. Este requerimiento fue infructuoso. El señor Miranda le indicó que el Centro "era muy caro". Tampoco quiso llevarla al Hospital Regional de Arecibo. Acordaron que la trasladaría directamente a su oficina. Cuando lo hacía, sufrió un desmayo. Llegó sin vida al Centro de Salud de Lares.

A raíz de su fallecimiento, no se realizó una autopsia completa. Sin embargo, se abrieron las cavidades toráxicas y se encontraron los pulmones "llenos masivamente de coágulos grasosos". T.E. de 9 de octubre de 1990, pág. 44. El doctor Rodríguez Acosta, quien antes la había examinado, consignó en una nota de defunción que la muerte se debió a una *"arritmia cardíaca", o a un tromboembolismo pulmonar masivo.* Apéndice a la solicitud de revisión, pág. 13.

El ilustrado foro de instancia concluyó, en síntesis, que no se demostró que la operación de liposucción fuera la causa de la muerte. A juicio suyo, el fallecimiento fue "consecuencia de un problema de naturaleza cardiopulmonar de *evolución rápida* y aguda. La probabilidad mayor es que la paciente fallece de embolia pulmonar vascular *súbita,* el desarrollo de la cual pudo haber facilitado dicha paciente o aquel que le retiró la faja abdominal. El retiro de la faja abdominal crea un problema de falta de sostén de la pared abdominal y puede interferir con el retorno venoso, haciendo éste menos eficiente lo cual es una de las causas principales de la condición conocida como trombosis venosa profunda (TVP)". (Énfasis suplido.) Apéndice a la solicitud de revisión, pág. 16.

Ante nos, los demandantes recurrentes Miranda *et als.* reiteran como error esa determinación judicial. Insisten en

que el doctor Candelario Torres fue negligente durante el proceso de la liposucción y al dar de alta a la señora Muñoz Matos a pesar del precario cuadro clínico que ofrecía.

## II

Incidió el tribunal de instancia. El hecho de que la señora Muñoz Matos saliera del quirófano con una presión arterial de apenas 95/70 y aproximadamente 7 gramos de hemoglobina, es indicativo de que su condición post operatoria no era ciertamente la mejor. Máxime, que durante la intervención se le extrajeron 3,200 cc de fluido corporal (grasa y sangre).

El testimonio presentado por el perito de la parte recurrente, Dr. Walter J. Benavent —reconocida autoridad en cirugía plástica— corrobora que en este caso medió negligencia. Según su opinión, la señora Muñoz Matos no era una persona indicada para esta operación cosmética debido a su corta estatura, excesivo peso y alta presión arterial. En particular, puso en entredicho la naturaleza del procedimiento clínico a que fue sometida, mediante el cual se le aspiraron *extensas áreas del abdomen, muslos y caderas.* T.E. de 9 de octubre de 1990, págs. 10–11. En su informe escrito expresó: "El extraer 3200cc de aspirante y reponer tan sólo 500cc [entre sangre y plasma] es a todas luces insuficiente. *Las pruebas de sangre revelan que hubo una pérdida substancial de sangre.* Al salir de la sala de recuperación para trasladarse a su hogar a un punto tan distante como Lares, su presión arterial era de 95/70, lo que indica que *la paciente estaba entonces en un estado de shock hipovolémico.* El hecho que la paciente falleció al cabo de 4 días me hace sospechar que murió en un estado de shock crónico y complicado más aún por tromboembolismo pulmonar masivo, según informe del patólogo forense, Dr. Francisco Cortés." (Énfasis suplido.) Apéndice a la solicitud de revisión, pág. 31. Finalmente, en su decla-

ración, el doctor Benavent relacionó *directamente* la liposucción con la muerte, a la luz del material encontrado en los pulmones. T.E. de 9 de octubre de 1990, págs. 23, 44 y 83–84.

El dictamen del foro de instancia se fundamentó en el testimonio del patólogo Dr. Ángel Román Franco.

El caso de autos es novel, pues se trata de un tratamiento quirúrgico selectivo, con fines *estéticos*, tratado como *ambulatorio*. El mismo, por regla general, está recomendado sólo para personas menores de cuarenta (40) años. Como riesgo, se reconoce que la muerte puede sobrevenir de una embolia o del "desbalance en el fluido causado *por la remoción excesiva de grasa en una sola vez*. La cantidad segura a ser removida en una operación está entre 1,000 y 1,500 cc.". (Traducción y énfasis nuestros.) Robertson y Keavy, *op. cit.*, pág. 314. Véase, además, *Report on Surgical Suction Lipectomy* de 20 de enero de 1983, pág. 8.

Como concluye la Sentencia de hoy, pág. 128, los hechos expuestos nos mueven a concluir "razonablemente" que la "muerte de la Sra. Hilda Muñoz Matos fue causada por negligencia, consistente —según opinó el Dr. Walter J. Benavent— en que no era candidata idónea para una cirugía de liposucción. Se le removió una cantidad sustancial y exagerada de líquido en una sola intervención, todo ello en contra de la mejor práctica de la medicina. T.E. de 9 de octubre de 1990, págs. 11 y 17. Por último, fue dada de alta prematuramente. Íd., pág. 17".

—O—

Opinión concurrente emitida por el Juez Asociado Señor Hernández Denton.

Surge de la prueba testifical y documental —y en particular de la información ofrecida por el perito de la parte recurrente, el Dr. Walter J. Benavent— que al concluir la

operación la paciente había perdido mucha sangre y tenía una *hemoglobina de 7.9 gramos*, su condición post operatoria era crítica y requería transfusiones de sangre para restablecer su volumen circulatorio. Al darle de alta sin proveerle un buen tratamiento post operatorio, se cometió impericia médica. Por esta razones, concurro con la sentencia del Tribunal que revoca el dictamen recurrido.